E-FILED on     9/20/07

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MEMRY CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>KENTUCKY OIL TECHNOLOGY, N.V., PETER BESSELINK, MEMORY METALS HOLLAND, B.V.,<br><br>Defendants. | No. C-04-03843 RMW<br><br>ORDER DENYING MEMRY'S MOTION TO DISQUALIFY EXPERT KENNETH PERRY; DENYING STC'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT STC DID NOT MISAPPROPRIATE ANY TRADE SECRETS; DENYING STC'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT KOT'S CLAIM FOR CORRECTION OF INVENTORSHIP BE DISMISSED<br><br>[Re Docket Nos. 339, 345, 616] |
| KENTUCKY OIL TECHNOLOGY, N.V.,<br><br>Counterclaimant,<br><br>v.<br><br>MEMRY CORPORATION and SCHLUMBERGER TECHNOLOGY CORPORATION,<br><br>Counterdefendants. | |

On May 25, 2007, the court heard seven motions for partial summary judgment: two motions filed by counterdefendant Memry Corporation ("Memry"); five motions filed by counterdefendant Schlumberger Technology Corporation ("STC"). Memry joined in STC's five motions. This order

ORDER RE: STC'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT—C-04-03843 RMW
MAG

addresses (1) STC's Motion for Partial Summary Judgment That STC Did Not Misappropriate Trade Secrets, Docket No. 345 and (2) STC's Motion for Partial Summary Judgment That KOT's Claim for Correction of Inventorship Be Dismissed, Docket No. 339. This order also addresses Memry's Motion to Disqualify the Expert Testimony and Declaration of Kenneth E. Perry Ph.D, Docket No. 616, upon which defendant and counterclaimant Kentucky Oil Technology, N.V. ("KOT") in part bases its opposition to STC's misappropriation motion.[1]

## I. BACKGROUND

### A. Trade Secrets at Issue

In its supplemental identification of trade secrets submitted to STC and Memry on July 5, 2005, KOT identified 26 trade secrets, which can be generally grouped as follows: (1) detailed explanation of the principles and theory of operation of bistable and multistable cells; (2) various design techniques and exemplary cell patterns for creating bistable cells; (3) electronic files developed at LPL for laser cutting specific bistable cell patterns; (4) the suggestion that bistable cells could be used as support structures in other than medical applications, specifically for wellbore support; (5) certain know-how and techniques for modeling, evaluating, designing, testing, and manufacturing and laser cutting bistable cell structures and related to locking mechanisms for retaining bistable structures in locked and unlocked states; (6) metrics for evaluating bistable cell structure performance from prototype testing; (7) criteria for selecting materials suitable for use in bistable cell structures; (8) techniques, experience, analysis, know-how and performance evaluation metrics for scaling up a bistable cell design when resizing the cell pattern for a tube of a different diameter. Declaration of William Cass Supp. Memry Mot. Summ. J. That KOT Estopped from Asserting Loss of Trade Secrets ("Cass Decl."), Ex. 4, Supplemental Identification of Trade Secrets at 2-15; *id.*, Ex. 6, KOT's Further Supplemental Responses to STC's Interrogatory Nos. 3, 5 and 9.

---

[1] In conjunction with those motions for summary judgment, the parties have filed requests for judicial notice and objections to evidence submitted by the other party. The requests for judicial notice are not opposed and are granted. The parties' evidentiary objections will be addressed as necessary to the evidence considered by the court.

### B.     Factual Background

Peter Besselink ("Besselink") allegedly invented the Biflex technology that is at issue in this case. He assigned the Biflex technology to Memory Metals Holland ("MMH") which contracted with United Stenting ("U.S. Inc."), a company affiliated with Dr. Wilfried van Moorleghem, to develop prototypes of small diameter tubes using Biflex technology. MMH and U.S. Inc. worked with LPL Systems, a company that specialized in laser cutting, to manufacture the prototypes.

Besselink filed U.S. provisional application Serial No. 60/036,359 on January 24, 1997, describing and claiming the bistable and multistable cells for use in expandable structures for medical and non-medical applications. *Id.* Besselink filed U.S. patent application Serial No, 09/012,843 ("the '843 application") and PCT International Application PCT/US98/01310 ("the '310 application") on January 23, 1998, claiming the benefit of priority of the U.S. provisional patent application. *Id.* On December 3, 2002, U.S. Patent No. 6,488,702 entitled "Bistable Spring Construction for a Stent and Other Medical Apparatus," issued from Besselink's '843 application. Each claim of the '702 patent claims a stent. RJN Supp. STC's Mots. Summ. J. ("STC RJN"), Ex. F. (claim 1: "A stent having a plurality of stable configurations. . ."; claim 7: "A tubular stent having a surface comprising a plurality of cells. . .").

In 1998, Besselink began discussing with Memry the possibility of making prototype devices of the bistable cell expandable tubes for medical applications. On October 28, 1998, MMH and Memry executed a secrecy agreement that required Memry to keep material disclosed in connection with the parties' collaboration confidential for three years. The agreement recites that "MMH has developed secret and confidential knowledge and information relating to a proprietary stent system, as described by patent application US09/012,843."

In June 1999, U.S. Inc. executed a collaboration agreement with a Memry subsidiary under which Memry was to "scale up" previous expandable tube designs to develop at least two stents, both based on the Biflex principle to demonstrate the principle for use in larger diameter stents. Thereafter, Besselink, MMH, and U.S. Inc. began sharing confidential information with Memry employees in Menlo Park, California ("Memry West employees"). The "scale up" work essentially ceased after engineer Minh Dinh left Memry's employment in November 1999. Moyer Decl., Ex. C, Besselink Dep.

1    at 134:9-15; Ex. E, van Moorleghem Dep. at 210:1-8; Ex. K, van Moorleghem Dep. at 69:8-11, 120:5-
2    15.  None of the Memry West employees who participated in Memry's work for Besselink had any oral
3    or communications with any STC employee.  Declaration of Scott Carpenter ¶ 10; Declaration of Joseph
4    Pasqualucci ¶ 6; Declaration of Minh Dinh ¶ 11; Declaration of Philippe Poncet ¶ 13; Declaration of
5    Ming Wu ¶ 22; Declaration of James Binch ¶ 16.

6    Starting in early 1999, Memry's then-Chief Scientist, L. MacDonald Schetky was in
7    communication with Besselink and van Moorleghem regarding the Shape Memory and Superelastic
8    Technologies Conference to be held in September 1999 in Antwerp, Belgium.  Declaration of L.
9    MacDonald Schetky Supp. STC's Mots. Summ J. ("Schetky Decl.") ¶ 9.  As part of their preparations
10   for the conference, Schetky reviewed drafts of the paper presented and published by Besselink and van
11   Moorleghem at that conference titled "Biflex Stents" (the "Besselink Article").  *Id.*  Besselink and van
12   Moorleghem disclosed detailed information regarding the trade secrets at issue in this case to Schetky
13   in Belgium on September 4-10, 1999, during a three-day meeting at Dr. Schetky's home on December
14   6-9, 1999; on a trip in Belgium and Switzerland on January 25-27, 2000; and at other meetings.  *See,*
15   *e.g.*, Declaration of Jeffrey Wexler Supp. Mot KOT's Opp'n STC's Mot. Summ. J. re: Misapprop. Trade
16   Secrets ("Wexler Decl. (misapprop trade secrets)"), Ex. F, van Moorleghem Dep. (Day 1) at 74:15-99:2,
17   116:24-118:8, 140:20-142:20; *id.*, Ex. E, van Moorleghem Dep. (Day 2) at 287:22-288:2, 324:10-326:2.

18   On June 26, 2000, Schetky met with STC employee Craig Johnson and consultant Barrie Hart
19   at STC's research facilities in the United Kingdom.  Schetky Decl. ¶ 18.  Johnson had an idea for
20   developing an expandable sand screen using shape memory alloy ("SMA") that could be actuated to
21   expand by geothermal or electrical heat.  Decl. of Craig Johnson ("Johnson Decl.") ¶¶ 11-12.  Schetky
22   and Johnson concluded that the SMA idea was not possible and Schetky proposed using a bistable cell
23   design as a component of an expandable sandscreen that could snap open with input of mechanical
24   force. Johnson Decl. ¶ 11.  Schetky gave Johnson a copy of the Besselink Article.  Johnson faxed the
25   Besselink Article to his supervisor at STC, Patrick Bixenman.  Decl. of Patrick Bixenman ("Bixenman
26   Decl.") ¶ 12.  Thereafter, other STC employees received the Besselink Article.

27   In July 2000, Schetky asked Besselink to provide samples of the medical stent prototypes for
28   demonstration to STC.  Besselink responded by proposing that he and van Moorleghem team up with

ORDER RE: STC'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT—C-04-03843 RMW
MAG                                                              4

Memry to work on the project. He asked Memry to propose terms for their participation in the project. On October 17, 2000, Schetky wrote to Besselink offering him a consultancy on the project to be paid from a portion of what Memry would realize "in the event that the program progresses to commercialization." Moyer Decl., Ex. P. As presented by Schetky, Besselink was offered a consultant position on the sand screen project but would not be listed as an inventor on any of the patent applications that were to be filed as part of the project, drafts of which had already been prepared. *Id.* Besselink did not pursue this opportunity.

The STC sand screen project commenced. Schetky participated meetings held during the conceptual phase of the project during the fall and winter of 2000. Memry employees James Binch and Ming Wu drafted the development agreement and negotiated the intellectual property terms between Memry and STC. STC and Memry formally entered into a development agreement on January 2001 the stated purpose of which was to "determine the feasibility of using bi-stable cell techniques and technology for creating expandable conduits and other devices in wells." Griffin Decl., Ex. B, Development Agreement. As provided in that Development Agreement, in 2000 and 2001, STC filed a number of patent applications for inventions related to applying the Biflex technology by Besselink in oil well applications. These patent applications have matured into the following patents:

- U.S. Patent No. 6,648,071 issued November 10, 2003: ("the '071 patent") titled "Apparatus Comprising Expandable Bistable Tubulars And Methods for Their Use in Wellbores" lists as inventors Hackworth, Johnson, Bixenman

- U.S. Patent No. 6,688,397 issued February 10, 2004: ("the '397 patent) titled "Techniques for Expanding Tubular Structures" which lists as inventors McClurkin, Mills, Johnson

- U.S. Patent No. 6,695,054 issued February 24, 2004: ("the '054 patent") titled "Expandable Sand Screen And Methods for Use" which lists as inventors Johnson, Hackworth, Bixenman

- U.S. Patent No. 6,772,836 issued August 10, 2004: ("the '836 patent") titled "Expandable Tubing and Method" which lists as inventors Schetsky, Johnson, Hackworth, Bixenman

- U.S. Patent No. 6,799,637 issued October 5, 2004: ("the '637 patent") titled "Expandable Tubing And Method" which lists as inventors Schetsky, Johnson, Hackworth, Bixenman[2]

---

[2] On March 10, 2004, Besselink filed a petition seeking to have STC's '637 patent withdrawn from issue to seek an interference with an application based on Besselink's original provisional application. STC RJN, Ex. H. The petition was rejected as "filed for an improper purpose." *Id.* at 5.

ORDER RE: STC'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT—C-04-03843 RMW
MAG                                                                  5

1  STC RJN, Exs. A-E.  These are known collectively as the "STC patents."  Although STC admits that
2  each of the STC patents "included certain text and figures explaining the background of 'bistable'
3  concepts that are similar to the text and figures" the '310 application and the '702 patent, none of the
4  claims of these patents recites a stent.  STC's Mot. Summ. J. on Correction of Inventorship at 6.

5  In about October 2000, STC engineers Craig Johnson, Patrick Bixenman and Matthew
6  Hackworth, along with consultants Barrie Hart and Altair Engineering Ltd. began cell design work on
7  the STC project.  Decl. Barrie Hart ("Hart Decl.") ¶ 7.  Schetky provided Hart a copy of the Besselink
8  Article, but no information regarding Memry's prior work on bistable stents.  Hart Decl. ¶ 10-15; *see*
9  *also* Reply Decl. of Craig Johnson Supp. STC's Mot's Summ. J. ("Johnson Reply Decl.") ¶ 10.[3]  Martin
10 Kemp, an employee of Altair since October 2000 when Altair was engaged by STC to provide
11 engineering services for the bistable sand screen, states that the starting point of the STC bistable cell
12 design is the "simple bi-flex design" depicted at page ST036025 of a document entitled "Design
13 analysis, Schlumberger Bi-Stable Expandable Casing, 27 February 2001.  Reply Decl. of Martin Kemp
14 Supp. STC's Mot's Summ. J. ("Kemp Reply Decl.") ¶ 7, Ex. A at ST036025; *see* Johnson Reply Decl.
15 ¶ 6.  The "simple bi-flex design" depicts a single cell with a thin upper strut and a thick lower strut.  This
16 depiction is identical to the drawing in the Besselink Article published in September 1999.  *See* Johnson
17 Decl., Ex. C at ST00214.  This "simple bi-flex design" was the basis for several test specimens in
18 November and December 2000.  Johnson Reply Decl. ¶¶ 11-12.

19 After designing and testing several cell design iterations in November and December 2000, it
20 became apparent that it would be difficult to obtain bistable spring action in cells made from steel
21 because there was unacceptable deformation at hinges.  *Id.* ¶ 12-13.  After experimentation with thicker
22 vertical bars at the end points of the cell, Altair, using its computer systems, concluded that a bar linkage
23 in the shape of a "horn" would most effectively store and release energy during expansion of the cell.
24 *Id.* ¶ 14.  Between January and March 2001, the sand screen design team studied various horn
25 configurations, including a "double horn" configuration suggested by Johnson.  *Id.* ¶ 16-17.  The double

---

[3] Even were the court to consider Dr. Perry's supplemental report, his conclusion that Mr. Hart's design files are incomplete is inadmissible.  Because Perry has not established that he possesses design experience in the oil well industry, there is no foundation for his opinion as to what the files of an engineer working in the oil industry should include.

1    horn configuration continued to evolve through March 12, 2001 to include a second spring element.
2    *Id.* ¶ 17, Ex. C. Past 2001, it would appear that the design continued to evolve to attempt to reduce
3    deformation and increase collapse resistance, with additional design elements being added. *Id.* ¶ 21-22.

4        STC states that throughout the project it used third party vendors to manufacture and cut the
5    prototypes for STC's sand screen project, one of which, Laser Fare, was suggested by Memry. Neither
6    STC nor Memry received any of the computer files or code for cutting machinery from these vendors.
7    Johnson Decl., ¶ 24, 31; Hackworth Decl. ¶ 17-18; Bixenman Decl., ¶ 27. Memry performed some
8    testing of the prototypes directed toward expanding the bistable cell prototypes, but those tests provided
9    only incomplete and unreliable data.   Johnson Decl., ¶ 26; Hackworth Decl. ¶ 19; Bixenman Decl., ¶
10   22. Other testing was performed by STC employees or third party consultant TerraTek at either STC
11   or TerraTek facilities. Johnson Decl., ¶ 27; Hackworth Decl. ¶ 20; Bixenman Decl., ¶ 23.

12       Schetky observed tests being conducted by STC, but did not make any usable suggestion as to
13   how to perform the tests or interpret their results. According to the counterdefendants, neither Schetky
14   nor any other Memry employee (1) participated in any numerical modeling or finite element analysis
15   of any designs during the STC sand screen project; (2) made any usable suggestions regarding selection
16   of materials to be used in the project; (3) made any usable contribution to the design of the cells or the
17   patterns that were cut in the steel base pipe in the project; or (4) participated in the development of the
18   cutting machinery used to cut steel base pipes (the specifications for which were written by LAI
19   International, Inc. and which was built by Concepts 4 Progress). Johnson Decl., ¶ 27-31; Hackworth
20   Decl. ¶ 20-24; Bixenman Decl., ¶ 23-27.

21       STC allegedly did not receive documents, electronic files or information identified as belonging
22   to Besselink, MMG, U.S. Inc., LPL Systems, Jomed or Abbott. Johnson Decl., ¶ 18; Hackworth Decl.
23   ¶ 14; Bixenman Decl., ¶ 36. Although they received the Besselink Article from Schetky and other
24   Memry employees, neither Schetky nor any other Memry employee or officer showed a demonstration
25   of a bistable stent to STC, nor did any STC employee ever see one except for the image included in the
26   Besselink Article. Johnson Decl., ¶ 22; Hackworth Decl. ¶ 15; Bixenman Decl., ¶ 19. Schetky testifies
27   that he does not recall ever receiving from Besselink or van Moorleghem any written or oral disclosure
28   of information relating to Memry's scale up project with Besselink. Schetky Decl. ¶ 21.

ORDER RE: STC'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT—C-04-03843 RMW
MAG                                        7

1    In opposition, KOT presents the expert opinion of Dr. Kenneth Perry, a mechanical engineer
2 with expertise in the mechanics of materials. In his opinion, at least some of the people who were
3 involved in developing the bistable cell design for the STC sand screen project optimized the design by
4 using at least some of the trade secrets claimed by KOT. His opinion is that these trade secrets must
5 have been used based on the advanced starting point of the STC bistable design and the short period of
6 time from the beginning of the work for STC on the bistable design to the time STC's "double horn"
7 design was developed.[4] Declaration of Dr. Kenneth Perry ¶ 4.

## II. ANALYSIS

### A.    Motion to Disqualify Expert Kenneth Perry

Federal Rule of Evidence 702 permits testimony by experts qualified by "knowledge, skill, expertise, training, or education" to testify "in the form of an opinion or otherwise" based on "scientific, technical, or other specialized knowledge" if that knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court set out the relevant standard by which courts should determine whether to admit expert testimony into evidence. The Court held that the guiding factors in this determination are whether the expert testimony reflects "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592; *see also United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir.), *amended by* 246 F.3d 1150 (9th Cir. 2001) (to be admissible, "expert testimony must . . . address an issue beyond the common knowledge of the average layman.").

STC seeks to disqualify KOT's expert, Kenneth Perry, PhD, from offering expert testimony on technical issues relating to the development of oil well components and the application of bi-stable cell designs in oil well components because he lacks experience, training or education in the field of oil well technology. There is no dispute that Dr. Perry has never worked in the oil service industry or studied any device used in an oil well prior to his retention as an expert witness in the present case. Declaration of William Cass Supp. Mot. Disqualify Expert ("Cass Decl. (disqual. expert)"), Ex. 4, Dep. Kenneth

---

[4]    Although Dr. Perry does not explain the significance of the development of the "double horn" design, it would appear that the STC cell design went from the "simple bi-flex design" depicted at page ST036025 of a document entitled "Design analysis, Schlumberger Bi-Stable Expandable Casing, 27 February 2001 to a more complex "double horn" design.

1  Perry 47:24-48:3.  STC argues that he should be disqualified from providing expert opinion that STC
2  and Memry could not have independently developed a bi-stable oil well casing based on publicly
3  available technical information, because he is unqualified to testify as to the state of the art in oil well
4  component engineering or development protocols and methods used in the oil industry.

5  Dr. Perry's CV states that his "technical expertise is in the mechanics of materials" and that he
6  "has extensive practical experience working with companies to design and develop medical devices."
7  It also states that "Dr. Perry has developed a strong reputation for using advanced finite element analysis
8  to address issues of product performance and reliability and has worked with a range of materials
9  including ceramics, biopolymers, Nitinol and other advanced engineering alloys."  He testifies that his
10 expertise in designing expandable tubular structures, general engineering background, and experience
11 with product development, design and finite element analysis of tubular stents in the medical fields are
12 relevant expert opinion in this case.  Cass Decl. (disqual. expert), Ex. 4, Dep. Kenneth Perry 48:4-25.

13 Here, Dr. Perry is an engineer with experience in the field of mechanical engineering in
14 expandable tubular devices in the medical field. While he may not be a specialist in the field of oil well
15 applications or have experience in oil well structure engineering, he does have experience with
16 expandable metal tubes in the medical device context and the trade secrets at issue here involve
17 information regarding how to apply the technology originally disclosed for use in medical devices to
18 larger oil well structures. Further, his opinion is based upon an analysis of cell designs set forth in Altair
19 engineering reports.  The engineering reports include finite element analysis, which is one of Dr. Perry's
20 areas of experience.  Overall, his lack of experience in the oil well industry goes to the weight of his
21 testimony, not to its admissibility, therefore the court declines to disqualify him as an expert or to strike
22 his expert testimony as a whole.

23 STC also asserts that Dr. Perry's expert report is unreliable because it is incomplete because he
24 did not consider design documents by Barrie Hart (designated M1260-M1648) in rendering his expert
25 report or reply declarations submitted by the STC engineers involved in the sand screen project.  KOT
26 attempts to remedy this deficiency by submitting a declaration analyzing the omitted Hart files.
27 Although the court rejects STC's argument that these omissions from Dr. Perry's report render it
28 unreliable, particularly in light of his analysis of the finite element analysis in the Altair engineering

ORDER RE: STC'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT—C-04-03843 RMW
MAG                                                                  9

reports, this additional report was produced after the cutoff for submitting expert reports and was submitted without leave of the court. Therefore the court strikes Dr. Perry's Declaration in Support of KOT's Opp'n to Memry's Mot. to Disqualify Expert but does not strike Dr. Perry's testimony in its entirety.

### B. STC's Motion for Partial Summary Judgment that it Did Not Misappropriate KOT Trade Secrets

#### 1. Title to the Disputed Trade Secrets

STC renews its assertion, originally set forth in its Motion for Partial Summary Judgment that KOT Lacks Standing to Assert Trade Secret Misappropriation, that no trade secrets were transferred through the chain of title to KOT. Based on STC's present motion, the court sees no reason to reconsider its determination regarding the transfer of trade secrets as set forth in the court's December 18, 2006 Order Denying Counterdefendants' Motion for Partial Summary Judgment Contingent on Proof of Authentication ("December 18, 2006 Order"), Docket No. 228.

#### 2. Misappropriation

STC seeks to establish that the undisputed facts show that STC did not misappropriate KOT's trade secrets because STC had no access to the trade secrets. STC contends that it did not receive the asserted trade secrets from Memry through Schetky or otherwise. According to STC, the only information STC had from Besselink was the published Besselink Article. First, STC seeks to demonstrate that Schetky only had access to the Besselink Article and not to any information produced by the project to "scale up" of Besselink's stent demos undertaken by Memry West or to any information received directly from Besselink or van Moorleghem. Second, STC presents the declarations of engineers involved in the STC sand screen project to demonstrate that Memry's involvement was only *de minimis*, with the bulk of the research, development, design, testing and prototype manufacturing done by STC and its contractors.

California Civil Code § 3426.1 defines misappropriation as the acquisition of a trade secret by someone who knows or has reason to know that it was acquired through improper means, or the disclosure or use of a trade secret without consent by a person who, at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was acquired under circumstances giving

1  rise to a duty to maintain its secrecy.[5] A plaintiff has the burden of establishing that defendants
2  misappropriated the alleged trade secrets.

3       It does not appear to be disputed that the Memry West engineers in Menlo Park involved in
4  Besselink's scale up project did not have direct contact with STC, nor did STC have contact with those
5  engineers or any of the vendors used in the project. Nevertheless, KOT asserts that Schetky provided
6  the path from Besselink to Memry to STC.

7       STC has submitted declarations of the Memry West engineers that they did not provide
8  information to Schetky, as well as declarations of STC engineers that worked on the sand screen project
9  stating that they did not receive *usable* information from Schetky. However, the uncontradicted
10 evidence does not establish that Schetky had access only to the Besselink Article. For example, it is
11 undisputed that Besselink and van Moorleghem were in contact with Schetky prior to the Antwerp
12 conference in September 1999 at which the Besselink Article was presented. Although Schetky sets
13 forth in his declaration that he *does not recall* receiving information directly from Besselink and van
14 Moorleghem, Schetky Decl. ¶ 21, both Besselink and van Moorleghem have testified that they discussed
15 the alleged trade secrets with him before, during and after the Antwerp Conference. *See, e.g.*, Wexler

---

[5] The California Uniform Trade Secrets Act defines misappropriation in full as follows:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>     (A) Used improper means to acquire knowledge of the trade secret; or
>     (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>         (i) Derived from or through a person who had utilized improper means to acquire it;
>         (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>         (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>     (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1

1  Decl. (misapprop. trade secrets), Ex. F, van Moorleghem Dep. (Day 1) at 74:15-99:2, 116:24-118:8,
2  140:20-142:20; *id.*, Ex. E, van Moorleghem Dep. (Day 2) at 287:22-288:2, 324:10-326:2.[6]

3  KOT also presents the expert testimony of Dr. Perry, discussed in further detail above, who states that it is more probable than not that STC's bistable tube was developed using KOT's trade secrets. His opinion "is based on the relatively advanced starting point of the STC bistable cell design and the relatively short period of time from the beginning of the work for STC on the bistable design to the time that the 'double horn' design was developed." Perry Decl. ¶ 4. For the reasons set forth above, Dr. Perry's opinion carries less weight because he is not a mechanical engineer in the oil industry, and the court finds his testimony to be somewhat conclusory, but it provides some circumstantial evidence that STC may have had access to the trade secrets KOT asserts.[7]

Finally, STC seizes upon an argument made by KOT in opposition to the counterdefendants' motions for partial summary judgment that the trade secret misappropriation is time-barred: KOT argued that van Moorleghem authorized Memry to pitch biflex to STC in April 2000. In the context of the motion that the trade secret misappropriation claim was time-barred, KOT argued that this authorization prevented the statute of limitations from running. The court rejected that argument in the order addressing that motion. The court likewise rejects STC's argument that because misappropriation is

---

[6] KOT also seeks to assert that the demonstration stents produced for Memry's use during the "scale up" project or stents sent to Memry for electropolishing may have been transmitted to Memry or STC employees or consultants working on the STC sandscreen project (from which Memry or STC could have gained detailed information about the Biflex trade secrets asserted). Opp'n STC's Mot. Summ. J. re: Misapprop. Trade Secrets at 5. The evidence it presents in support of this argument is wholly unconvincing. Philippe Poncet of Memry West testified that he never took the samples out of the box in his office. Wexler Decl. (misapprop. trade secrets), Ex. B, Dep. of Philippe Poncet at 35:16-40:1. Although KOT argues that there is a picture of one of these stents on the STC's website, the evidence it presents to confirm that the depiction on the website is one of the stents in Poncet's possession does not do so.

[7] The parties devote portions of their briefing to arguing whether the circumstantial evidence of trade secret misappropriation presented by Dr. Perry is negated by the direct declarations of the STC sand screen project engineers that they had no contact with Memry West employees, received no usable information from Schetky and conducted the research and development independent of any trade secrets KOT asserts. The court agrees that the verbal testimony of interested witnesses cannot entirely counter the circumstantial evidence of trade secret misappropriation presented by KOT. *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 793 (9th Cir. 1976) ("[D]isclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process by independent invention. There is substantial authority for the proposition that the defendant in such a case ought to offer more than the verbal testimony of interested witnesses.").

ORDER RE: STC'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT—C-04-03843 RMW
MAG                                                    12

a disclosure or use of a trade secret without express or implied consent, this purported authorization "eviscerates [KOT's] principal trade secret misappropriation claim against STC". STC argues that van Moorleghem's authorization would have extended to any trade secret asserted in this case because he did not place any restrictions as to what Memry could disclose to STC about the Biflex technology. But even assuming that van Moorleghem made such a far-reaching authorization, it is unclear how this would have constituted authorization from Besselink to use the trade secret information. As set forth in further detail below, KOT has presented evidence that demonstrates that STC was aware of the fact that Besselink claimed inventorship in the Biflex technology and internally questioned their rights to use the technology even after van Moorleghem supposedly authorized use of the trade secrets at issue.

Overall, because KOT has presented evidence that trade secret information may have been transmitted to STC via Schetky and some evidence that the STC sand screen may have been developed using the trade secrets asserted by KOT, the court cannot conclude as a matter of law that STC did not misappropriate trade secrets.

### 3.     **Reliance on the Development Agreement**

STC also contends that its reliance on Memry insulates it from KOT's misappropriation claim. Arguing that it had an innocent state of mind, it contends that the terms of the Development Agreement along with Schetky's assurances that Besselink was aware that his patent did not cover oil well applications establish as a matter of law that STC did not knowingly misappropriate KOT's alleged trade secrets.

First, any reliance on the "No Conflicts" clause of the Development Agreement is misplaced. That clause reads as follows:

> Each Party represents and warrants that it, respectively, is under no obligation or restriction, nor will it assume any such obligation or restriction that does or would in any way interfere with, conflict with, or present a conflict of interest concerning the work to be performed under this Agreement.

Griffin Decl., Ex. C, Development Agreement § 6.1. Contrary to STC's urged reading, this is not a warranty that a party disclosing information under the Development Agreement has the intellectual property rights to disclose third party information – this section merely provides a representation and warranty that a party is not under an obligation or restriction that would interfere with the work under

ORDER RE: STC'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT—C-04-03843 RMW
MAG                                                                       13

the Development Agreement. Thus, because the next section provides that "Except as provided in Section 6.1, neither Party makes any warranty of any kind under this Agreement . . .", that section makes it clear that there is no warranty as to Memry's rights to disclose upon which STC may reasonably rely.

Second, even assuming the Development Agreement did include some sort of representation or warranty by Memry, the evidence presented does not establish as a matter of law that STC's reliance would have been reasonable. KOT points out that Johnson at STC was aware that Besselink was the inventor of the Biflex stent. Wexler Decl. (misapprop. trade secret), Ex. Q (email from Johnson to Schetky stating "I assume Peter Besselink is unaware of our meeting and our interest in such devices?"). After Schetky responded that Besselink was aware and had indicated that his patent "does not cover anything other than medical stents," *id.*, Johnson wrote to his colleague at STC Patrick Bixenman questioning the status of STC's use of Besselink's technology:

> Memry Corp have an agreement with the biflex stent inventor – Peter Besselink. Besselink is aware that Memry is talking to SLB about a bi-flex casing system. We have an agreement in place with Memry Corp, but I do not know where this puts us with Besselink if he decides to patent the idea.

*Id.*, Ex. R. KOT also presents an October 7, 2000 email commenting on a draft patent application in which Schetky cautioned Johnson "to avoid copying figures and numbers which have been used in Besselink's papers or patents" and advised him to create new drawings. *Id.*, Ex. W. In 2002, Memry cautioned STC against using the term "biflex" in an article being prepared by STC for the Society of Petroleum Engineers, urging the use of "bistable" or some other wording. *Id.*, Ex. CC (December 13, 2002 email from Binch to Schetky); *id.* Ex. DD (December 21, 2000 email from Schetky to Johnson). In April 2003, Schetky continued to offer suggestions for terminology that would not "conflict with the medical stent." Wexler Decl., Ex. EE (April 2, 2003 email from Schetky to Johnson).

As STC argues, the concerns expressed by Schetky, Binch and Johnson regarding the use of the term "biflex" and copying figures from Besselink's documents could reasonably be interpreted as the trademark and copyright concerns of authors preparing to publish an article discussing the application of medical device technology to a new industry. However, they could also just as reasonably be interpreted by a jury as concern by STC that Besselink had conflicting rights in the Biflex technology that Memry had not secured. Thus, based on the evidence presented, a finder of fact might also

reasonably determine that STC knew or reasonably should have known that the information received from Memry constituted trade secrets misappropriated from Besselink, even if the Development Agreement otherwise suggested that Memry had rights to everything it disclosed to STC. Accordingly, the court cannot conclude as a matter of law that STC's reliance on the Development Agreement precludes a finding that STC misappropriated the trade secrets asserted by KOT.[8]

### C. STC's Motion for Partial Summary Judgment That KOT's Claim for Correction of Inventorship Be Dismissed

Although KOT has not sued for patent infringement on Besselink's '702 patent, KOT asserts that Besselink should be named as a joint inventor of the '071, '397, '054, and '637 STC patents. STC presents two primary arguments why the court should grant summary judgment as to KOT's claim for correction of inventorship: (1) Besselink did not collaborate with anyone at STC because STC's applications and issued patents were based solely upon Besselink's published PCT application and (2) correcting inventorship under 35 U.S.C. § 256 would result in the invalidity of the STC patents.

#### 1. Collaboration

The court begins with a presumption that the named inventors of the STC patents are the true and only inventors. *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1301 (Fed. Cir. 2002). Besselink may, however, overcome this presumption by clear and convincing corroborating evidence that he contributed to the conception of the invention. *Id.* at 1302.

A patented invention may be the work of two or more joint inventors. "Because 'conception is the touchstone of inventorship,' each joint inventor must generally contribute to the conception of the invention." *Ethicon, Inc., v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (citing *Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994)). Thus, a joint invention is the product of "collaboration of the inventive endeavors of two or more persons working toward the same end and producing an invention by their aggregate efforts." *Kimberly-Clark Corp. v.*

---

[8] KOT also contends that STC is attempting to assert a reasonable reliance on counsel defense because it has offered the supporting declaration of Jeffrey Griffin, the STC intellectual property attorney in charge of the STC sandscreen project. In that declaration, Griffin states "STC believed that STC could lawfully acquire, use and disclose any information, technology or know-how that it would receive from Memry so long as it avoided infringing upon any copyright interest int eh Besselink Article or other publications and any patent claims issuing from the 1998 Besselink PCT Application or other patent applications." Griffin Decl. ¶ 14. The court does not find that this assertion constitutes a reliance on counsel defense.

1    *Proctor & Gamble Co.*, 973 F.3d 911, 916 (Fed. Cir. 1992).  "Joint inventorship under section 116 can
2    only arise when collaboration or concerted effort occurs – that is, when the inventors have some open
3    line of communication during or in temporal proximity to their inventive efforts." *Eli Lilly and Co. v.*
4    *Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004).

5        "An inventor 'may use the services, ideas and aid of others in the process of perfecting his
6    invention without losing his right to a patent.'" *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758
7    F.2d 613, 624 (Fed. Cir. 1985).  It is therefore unsurprising that "the alleged joint inventor seeking to
8    be listed on a patent must demonstrate that his labors were conjoined with the efforts of the named
9    inventors." *Eli Lilly*, 376 F.3d at 1359. STC asserts that Besselink's refusal to accept the consulting
10   position on the STC sand screen project offered by Schetky in October 2000 and the lack of evidence
11   that Besselink collaborated with STC precludes the correction of inventorship KOT seeks.

12       In opposition, KOT asserts that Besselink collaborated with STC by virtue of their common
13   collaboration with Schetky.  KOT presents evidence that Besselink communicated non-public details
14   regarding the use of bistable technology in well-bore applications with the Memry West employees
15   involved in Besselink's stent scale up project, Pasqualucci, Poncet and Dinh. *See* Declaration of Jeffrey
16   Wexler ("Wexler Decl."), Exs. F, G, L (emails between Messrs Besselink and van Moorleghem and
17   Messrs Paqualluci and Poncet from June and July 1999); Exs. I, J, K (emails and faxes between Dinh
18   and van Moorleghem from June 1999).  As set forth above, KOT has not established that these non-
19   public details made their way from the Memry West employees to Schetky.  But, although the
20   declarations of the Memry West employees indicate that they did not affirmatively communicate details
21   of the scale up project that are asserted by KOT as trade secrets, Schetky's declaration does not
22   necessarily establish that he did not receive such information from Memry West by way of another
23   source. *See* Schetky Decl. ¶ 21.  KOT also presents evidence that Besselink and van Moorleghem
24   themselves communicated the disputed information to Schetky. *See, e.g.*, Wexler Decl. (misapprop
25   trade secrets), Ex. F, van Moorleghem Dep. (Day 1) at 74:15-99:2, 116:24-118:8, 140:20-142:20; *id.*,
26   Ex. E, van Moorleghem Dep. (Day 2) at 287:22-288:2, 324:10-326:2. .

27       Besselink's refusal to participate as a consultant on the STC sand screen project does not
28   necessarily lead to the conclusion that he did not collaborate in the invention of the STC patents that

ORDER RE: STC'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT—C-04-03843 RMW
MAG                                                                 16

1 arose from that project. It is possible to reasonably infer that he was refusing to participate as a
2 consultant on the terms offered – for example, it is clear that Besselink felt that he was an inventor of
3 the Biflex technology but Schetky's offer of a consultancy was explicit that Besselink would not be
4 named as an inventor on any of the patents that would be filed as part of the project. Further, the
5 evidence in the record could reasonably suggest that Besselink collaborated with Schetky who then
6 collaborated with STC: KOT has presented evidence that Schetky had discussed the STC project with
7 Besselink and van Moorleghem before the patent applications were drafted, and that Schetky
8 subsequently participated in the design meetings with STC and communicated with Johnson at STC
9 throughout the sand screen project. Thus, because the evidence suggests it is possible that Besselink
10 collaborated in the inventive contributions provided by Schetky and other Memry personnel, the court
11 denies STC's motion for partial summary judgment that KOT's claim for correction of inventorship must
12 be dismissed.

### 2. Invalidity Resulting from Correction of Inventorship

14 STC contends that because 35 U.S.C. § 256 is designed to save a patent from invalidity, if
15 correcting inventorship would result in invalidity, the court cannot correct inventorship. It asserts that
16 adding Besselink as an inventor would invalidate the STC patents because, among other things, his prior
17 PCT application would be invalidating prior art because it was published (and thus constructively
18 reduced to practice) more than two years before the earliest filing date of the STC patents.

19 "If nonjoinder of an actual inventor is proved by clear and convincing evidence, a patent is
20 rendered invalid." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed. Cir. 1998) (citations omitted). 35
21 U.S.C. § 256 is designed to save a patent that is otherwise invalid for nonjoinder of an inventor. *Id.* at
22 1350 ("[I]f a patentee can demonstrate that inventorship can be corrected as provided by [35 U.S.C. §
23 256], a district court must order correction of the patent, thus saving it from being rendered invalid.")
24 The Federal Circuit sets forth the following approach to invalidity challenges for nonjoinder of a co-
25 inventor:

> When a party asserts invalidity under § 102(f) due to nonjoinder, a
> district court should first determine whether there exists clear and
> convincing proof that the alleged unnamed inventor was in fact a
> co-inventor. Upon such a finding of incorrect inventorship, a patentee
> may invoke section 256 to save the patent from invalidity. Accordingly,

> the patentee must then be given an opportunity to correct inventorship pursuant to that section.

*Id.* Courts have declined to correct inventorship where such a correction would necessarily require the court to make a finding that the patents are invalid. *See Oregon Health & Science Univ. v. Vertex Pharmaceuticals, Inc.*, 233 F. Supp. 2d 1282, 1285 (D. Or. 2002) ("Congress has conferred no jurisdiction on the federal courts to adjudicate a patent's validity in a Section 256 action to correct inventorship."); *see also Britesmile, Inc. v. Discus Dental, Inc.*, 2005 WL 1083194 at *4 (N.D. Cal. 2005) (White, J.) ("[T]o name Dr. Nathoo as an inventor on the patents at issue would necessarily require the Court to make a finding that the patents are invalid. Thus, Dr. Nathoo may not bring claims to correct the inventorship of the patents at issue pursuant to Section 256.").

In both *Oregon Health* and *Britesmile*, the purportedly omitted inventor communicated his invention after the patent application was filed, but before the patent was issued. Thus, naming him as an inventor on the patent would have necessarily required the court to make a "finding that the defendant was not in possession of the claimed subject matter at the time it filed the application or, in other words, that the patent [was] invalid [for failure to meet the 35 U.S.C. § 112 written description requirement]." *Oregon Health*, 233 F. Supp. 2d at 1285; *Britesmile*, 2005 WL 1083194 at *4. Unlike those cases, KOT does not assert that Besselink disclosed the invention claimed in the STC after the filing date of the disputed patents. STC asserts that the court should be concerned about the potential that Besselink's PCT application may be invalidating prior art. But assuming that Besselink is added as an inventor, the existence of a published patent by him does not necessarily result in invalidating the STC patents. Contrary to STC's argument, it does not appear that Besselink is claiming to be the sole inventor of the subject matter claimed by the STC patents, rather that he contributed to the inventions claimed therein. As STC pointed out, the Patent Office has previously rejected claims for a wellbore as unsupported by Besselink's patent application, *see* RJN Supp. STC Reply, Ex. A at 5, thus, it is possible that the prior applications would not be considered to have constructively reduced to practice the inventions relating to the expandable tubular devices claimed in the STC patents.

### III. ORDER

For the reasons set forth above, the court:

1. denies Memry's motion to disqualify the expert testimony of Dr. Kenneth Perry;
2. denies STC's motion for summary judgment that STC did not misappropriate trade secrets; and
3. denies STC's motion for summary judgment that KOT's claim for correction of inventorship be dismissed.

DATED:   9/20/07

*Ronald M. Whyte*

RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Memry:**
| | |
|---|---|
| Andrew C. Ryan | ryan@cantorcolburn.com |
| William J. Cass | wcass@cantorcolburn.com |
| Thomas Mango | tmango@cantorcolburn.com |
| Benjamin J. Holl | benjamin.holl@dbr.com |
| Charles A. Reid, III | charles.reid@dbr.com |

**Counsel for STC:**
| | |
|---|---|
| Nancy J. Geenen | ngeenen@foleylaw.com |
| David B. Moyer | dmoyer@foley.com |
| Kimberly K. Dodd | kdodd@foley.com |

**Counsel for KOT:**
| | |
|---|---|
| Michael H. Bierman | mbierman@luce.com |
| Nicola A. Pisano | napisano@JonesDay.com |
| Jeffrey David Wexler | jwexler@luce.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**       9/20/07                              /s/ MAG
                                            **Chambers of Judge Whyte**