1

2

3

4                                                              **E-FILED on** ___9/20/07___

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                       FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                    SAN JOSE DIVISION

11

12    MEMRY CORPORATION,                      No. C-04-03843 RMW

13             Plaintiff,                     ORDER RE: MEMRY AND STC'S MOTIONS
                                              RE: KOT'S COUNTERCLAIMS FOR TRADE
14        v.                                  SECRET MISAPPROPRIATION AND
                                              BREACH OF THE COLLABORATION
15    KENTUCKY OIL TECHNOLOGY, N.V.,          AGREEMENT BASED ON MISUSE OF
      PETER BESSELINK, MEMORY METALS          CONFIDENTIAL INFORMATION
16    HOLLAND, B.V.,                          **(Redacted Version)**

17             Defendants.                    **[Re Docket Nos. 308, 314, 319, 331, 363]**

18
      KENTUCKY OIL TECHNOLOGY, N.V.,
19
               Counterclaimant,
20
          v.
21
      MEMRY CORPORATION and
22    SCHLUMBERGER TECHNOLOGY
      CORPORATION,
23
               Counterdefendants.
24

25            On May 25, 2007, the court heard seven motions for partial summary judgment: two motions

26    filed by counterdefendant Memry Corporation ("Memry"); five motions filed by counterdefendant

27    Schlumberger Technology Corporation ("STC"). Memry joined in STC's five motions. This order first

28

1  addresses an authentication issue arising from STC's previous motion for partial summary judgment on

2  KOT's misappropriation and correction of inventorship counterclaims.  Next (because they are related

3  to one another and because KOT submitted a unified opposition) this order addresses (1) Memry's

4  Motion for Partial Summary Judgment that KOT's Counterclaims for Misappropriation of Trade Secrets

5  and Breach of Contract are Time Barred, Docket No. 331, and (2) STC's Motion for Partial Summary

6  Judgment That KOT's Claim of Trade Secrets Misappropriation is Barred Under the Applicable Statute

7  of Limitations, Docket No. 363.  Finally, this order addresses (3) Memry's Motion for Summary

8  Judgment That KOT is Estopped From Asserting Loss of Trade Secrets, Docket No. 319.[1]

9  ## I.  BACKGROUND

10  On May 14, 2004, plaintiff and counterdefendant Memry Corporation ("Memry") sued defendant

11  and counterclaimant Kentucky Oil Technology, N.V. ("KOT") for a declaratory judgment that it did not

12  misappropriate trade secrets from Peter Besselink ("Besselink"), Memory Metal Holland, B.V.

13  ("MMH"), and United Stenting ("U.S. Inc.").  In November 2004, KOT brought several counterclaims

14  against Memry and STC, which have since been amended.  At issue in the Memry and STC motions for

15  partial summary judgment addressed in this order are KOT's second counterclaim for breach of contract

16  based on misuse of confidential information and its third counterclaim for misappropriation of trade

17  secrets.

18  ### A.    Factual Background

19  KOT claims that Besselink is the inventor of "bistable" and "multistable" cells for use in

20  expandable structures.  Declaration of Peter Besselink Supp. KOT's Opp'n Memry and STC's Mots.

21  Summ. J. ("Besselink Decl.") ¶ 4.  A "bistable" cell is capable of assuming two stable states: a collapsed

22
23  [1]    In conjunction with these motions for summary judgment, the parties have filed requests for judicial notice and objections to evidence submitted by the other party.  The requests for judicial notice are not opposed and are granted.  The parties' evidentiary objections will be addressed
24  as necessary to the evidence considered by the court. However, at least one category of objections can be addressed up front.  STC objects to KOT's declarations as to the authenticity of deposition
25  excerpts on the basis that the declaring attorney does not have personal knowledge.  Mr. Wexler has personal knowledge that the documents are deposition transcripts taken during the discovery period
26  of this action and either Mr. Wexler himself or one of his colleagues personally attended each of these depositions.  Therefore, his declaration that the exhibits are true and correct copies of
27  discovery materials is testimony of a witness with sufficient knowledge, to permit authentication under Fed. R. Evid. 901(b).
28

state and an expanded state.  *Id.*  A "multistable" cell is capable of transitioning through a number of stable intermediate states between the collapsed state and the expanded state.  *Id.*  Together with proprietary cell designs, know-how and related analytical developments, this technology is known as "the Biflex technology."

Besselink filed U.S. Provisional Application Serial No. 60/036,359 ("the '359 application") on January 24, 1997, describing and claiming the bistable and multistable cells for use in expandable structures for medical applications.  *Id.*  Besselink filed U.S. Patent Application Serial No. 09/012,843 ("the '843 application") and PCT International Application PCT/US98/01310 ("the '310 application") on January 23, 1998, claiming the benefit of priority of the U.S. provisional patent application.  *Id.*  The '359 and '843 applications matured into U.S. Patent No. 6,488,702, entitled "Bistable Spring Construction for a Stent and Other Medical Apparatus."  Besselink assigned the Biflex technology to MMH.  MMH allegedly contracted with U.S. Inc. to develop prototypes of small diameter tubes using Biflex technology.  MMH and U.S. Inc. worked with LPL Systems, a company that specialized in laser cutting, to manufacture the prototypes.

In 1998, Besselink began discussing with Memry the possibility of making prototype devices of the bistable cell expandable tubes for medical applications.  The expandable tubes, called "stents," were to be placed in passageways to prevent collapse or blockage.  On October 28, 1998, MMH and Memry executed a secrecy agreement that required Memry to keep material disclosed in connection with the parties' collaboration confidential for three years.  The agreement recites that "MMH has developed secret and confidential knowledge and information relating to a proprietary stent system, as described by patent application US09/012,843."  Decl. of Andrew Ryan Supp. Mot. Second and Third Counterclaims are Time-Barred ("Ryan Decl."), Ex. 8, Secrecy Agreement.

In June 1999, U.S. Inc. executed a collaboration agreement with a Memry subsidiary ("the Collaboration Agreement").  Besselink Decl. ¶ 6; Declaration of William Cass Supp. Memry Mot. Summ. J. That KOT Estopped from Asserting Loss of Trade Secrets ("Cass Decl."), Ex. 4, Collaboration Agreement. Under the Collaboration Agreement, Memry was to "scale up" previous expandable tube designs "to develop at least two stents, . . . both based on the above Biflex principle."  Besselink Decl.

1   ¶ 6; Cass Decl., Ex. 4.  These prototypes were to serve a "demonstration modeling function, in order

2   [that] the Biflex principle c[ould] be demonstrated for 'larger diameter stents.'"  *Id.*  The Collaboration

3   Agreement provided that "all rights regarding know how, drawings, prototypes, ideas, patent

4   applications, other shared hard-ware and intellectual Property, remain integral and exclusively owned

5   by [U.S. Inc.]."  Cass Decl., Ex 4.

6        Thereafter, Besselink, MMH, and U.S. Inc. began sharing confidential information with Memry.

7   Besselink Decl. ¶ 6.  Besselink and Dr. van Moorleghem disclosed confidential information regarding

8   the tube designs and other aspects of the Biflex technology to Memry employees in Menlo Park,

9   California, Joe Pasquallucci, Philippe Poncet, Minh Dinh and Scott Carpenter.  *See* Declaration of

10  Jeffrey Wexler Supp. KOT's Opp'n STC Mot. Summ. J. that KOT Estopped from Asserting Loss of

11  Trade Secrets ("Wexler Decl. (loss of trade secrets)"), Exs. F, G, L (emails between Messrs Besselink

12  and van Moorleghem and Messrs Paqualluci and Poncet from June and July 1999); Exs. I, J, K (emails

13  and faxes between Dinh and van Moorleghem from June 1999).

14       KOT alleges that Memry's then-Chief Scientist, L. MacDonald Schetky ("Schetky") received

15  access to this information and became familiar with the principle of Biflex technology and was aware

16  of the work being done by Memry to "scale up" MMH's  prototype designs to larger diameter

17  expandable tubes.  Starting in early 1999, Schetky, Besselink and van Moorleghem were in contact

18  regarding the Shape Memory and Superelastic Technologies Conference to be held in September 1999

19  in Antwerp, Belgium.  Declaration of L. MacDonald Schetky Supp. STC's Mots. Summ J. ("Schetky

20  Decl.") ¶ 9.  As part of their preparations for the conference, Schetky reviewed the paper presented and

21  published by Besselink and van Moorleghem at that conference titled "Biflex Stents" (the "Besselink

22  Article").  *Id.*  Schetky has testified that he does not recall receiving any information other than the

23  Besselink Article directly or indirectly from Besselink, van Moorleghem or any other employee or

24  officer of Memry relating to the Biflex technology during that time or any other time. *Id.*  ¶ 21.

25       In 1999, STC retained Memry to develop expandable structures for supporting oil wellbores.

26  Schetky participated in that project.  In January 2001, the parties entered into a Development

27  Agreement, the stated purpose of which was to "determine the feasibility of using bi-stable cell

28

ORDER RE: MEMRY AND STC'S MOTIONS RE: KOT'S COUNTERCLAIMS FOR TRADE SECRET MISAPPROPRIATION AND
BREACH OF THE COLLABORATION AGREEMENT BASED ON MISUSE OF CONFIDENTIAL INFORMATION—C-04-03843
RMW
MAG                         4

1    techniques and technology for creating expandable conduits and other devices and wells."  Decl. of

2    Jeffrey Griffin Supp. STC's Mots. Summ. J., Ex. C, Development Agreement.

3        In an e-mail sent to Besselink on July 1, 2000, Schetky asked "if I could borrow the

4    demonstration Biflex stent to show the [STC] people when they visit us in Brookfield.  They are

5    interested in the concept and the demo model would be helpful to illustrate."  Ryan Decl., Ex. 14.

6    Besselink testified that he responded to Schetky in a phone conversation that he could not provide a

7    sample stent becasue the stents had been transferred to Jomed, which had purchased the Biflex

8    Technology in March 2000.  Declaration of David Moyer Supp. STC's Mots. Summ. J. ("Moyer Decl."),

9    Ex. A, Besselink Depo. (Day 1) at 179:20-181:11.

10       Besselink, Schetky and James Binch of Memry attended a conference in Crimea in September

11   2000 ("Crimea Conference").  At the Crimea Conference, Besselink was told by Schetky and Binch that

12   Memry was working with STC on wellbores and that they were interested in technology for that project.

13   Moyer Decl., Ex. A, Besselink Depo. (Day 1) at 181:18-184:16.  The three men discussed the use of

14   bistable cells for oil well applications and Besselink told Schetky and Binch that he should be part of

15   the project because he was in inventor of expandable devices.  *Id.* at 183:25-184:3.

16       Both before and after the Crimea Conference, Memry employee Ming Wu followed up on

17   Schetky's July 1, 2000 email.  Before the conference on September 19, 2000, in response to Besselink's

18   email acknowledging Memry's request for biflex stent samples, Wu emailed Besselink stating: "The

19   meeting with Schlumberger was held at our Brookfield office on 8/18.  Their needs in oil well drilling

20   and the biflex concept were discussed.  Mac is preparing a development timeline.  I am sure Jim and

21   Mac will fill you in with more details at the Crimea conference."  Schetky Decl., Ex. F.  After the

22   conference on October 2, 2000, Wu sent an email asking whether Besselink would provide three to five

23   biflex samples for "show and tell."  Moyer Decl., Ex. O.  Besselink responded stating that he and van

24   Moorleghem would rather meet with Schlumberger along with Schetky's team than send the samples,

25   stating that they had discussed the possibility of being directly involved in the project and that he and

26   van Moorleghem were "convinced that we can solve the technical problems easily with the know-how

27   that we gathered on our Biflex project."  *Id.*

28

On October 11, 2000, Besselink forwarded Wu's email to Schetky seeking a response to his inquiry about meeting with STC. Schetky responded stating in relevant part:

> The project has not started yet and the overall direction will not be Cambridge but Houston, Texas. There are many aspects of petroleum technology which have to be considered in defining the nature of an expandable casing and I will be meeting with the Houston people next week to discuss the overall strategy. As you know there are a wide variety of bistable structures which have been exploited, and the choice will strongly depend on the method of fabrication. We are talking of tubes to 20cm in diameter with wall thickness of up to 6mm; a far cry from stents. I am not sure just how you both would fit in the program since I don't think the parties involved want to consider diluting the patent structure. The original concept which I proposed was files [sic] as a disclosure and a patent application has already been prepared. There has been sufficient public documentation of bistable structures, including yours on stents, that there is no question of there being a patent conflict.

Moyer Decl., Ex. O.

Communications between Schetky and Binch indicated that Schetky acknowledged Besselink and van Moorleghem's claims to being inventors of the Bistable technology, but asserted that they only conceived of applying it to a medical device, but not an expandable pipe. He stated that he wanted to "wanted to ease them out of any thought of being involved in this project" to avoid conflict. Wexler Decl., Ex. M. Binch responded that they should be careful about how they handled the situation, since he was soon to be in the process of negotiating with van Moorleghem about the disposition of Memry Europe. *Id.*, Wexler Decl., Ex. B., Binch Dep. at 179:15-180:5.

On October 16, 2000, Besselink sent an email to George Shukov, Brian Moore, Ton van Roermund and van Moorleghem stating:

> After having discussed this item with Wilfried I let you know the following: please mind that Memry is not willing to share any intellectual property, nor any future revenues with us for using Biflex technology for pipe couplings. Therefore I suggest that we do not give them any information in regard to drawings, calculations or prototypes.

Ryan Decl., Ex. 16.

In a letter dated October 17, 2000, Schetky informed Besselink that he had conceived of using the Biflex technology for oil well applications, that he believed that Memry and STC were free to use the Biflex technology for non-medical applications and that STC and Memry had prepared a patent application directed toward using bistable structures in oil well applications that named only Memry and

STC employees as inventors. Ryan Decl. Ex. 17, Moyer Decl., Ex. P.[2]  The October 17, 2000 letter first states that the "senior engineer from Schlumberger visited yesterday and we reviewed the course of action which Memry will pursue in the period from October through December." Ryan Decl. Ex. 17. Schetky next makes it clear that he believed that he, not Besselink, came up with the concept of using the Biflex technology in oil wells: "As you know, when I thought of the idea of using the bistable cell configuration to create an expandable down hole pipe for the oil wells, I spoke with you about the subject and whether you were interested in participating." *Id.*  The letter also makes it clear that the oil well application utilizes the same bistable technology employed in Besselink's stents, stating, "At the time you indicated that with your activity in getting the Biflex Stent into production you were not interested in other applications of the concept." *Id.*  Schetky then discloses "that a patent application has been prepared and will have as the inventors Craig Johnson of Schlumberger, and me, representing Memry." *Id.*  Schetky also clearly stated that he believed that he was free to proceed with using the Biflex technology for non-medical applications. *Id.* ("The bistable cell which you employ for a specific product has been disclosed in the literature, and anyone can use this as long as it is not an infringement of your patent for the medical application.").

On October 20, 2000, Schetky and Craig D. Johnston of STC filed U.S. provisional patent application Serial No. 60/242,276, directed to the use of Biflex technology in oil wellbore devices.[3]

---

[2]     KOT objects to the October 17, 2000 letter from Schetky to Besselink on the grounds that it contains inadmissible hearsay. Based upon the fact that the court does not consider the contents of the letter for the truth of the matter, rather to show what information had been conveyed to Besselink by Schetky, the court overrules KOT's hearsay objection.

[3]     Schetky and other STC employees filed additional provisional patent applications embodying the Biflex technology, including U.S. provisional patent application Serial Nos. 60/261,749, filed January 16, 2001; 60/261,752, filed Jan. 16, 2001; 60/263,941, filed January 24, 2001; and 60/263,934, filed January 24, 2001. STC filed more than two dozen U.S. provisional, U.S. non-provisional and foreign patent applications claiming priority to the foregoing provisional patent applications ("the STC Applications"). The STC applications contain drawings and text similar to the Besselink applications and claims that are co-extensive with the Besselink applications. KOT contends that many of the STC applications disclose bistable cell designs disclosed in confidence to Memry by MMH and U.S. Inc. under the collaboration agreement. Counterclaim ¶ 23. United States Patents 6,648,071, 6,688,397, 6,695,054 and 6,799,637 have issued from the STC applications ("the STC Issued Patents")

1    In September 2001 at a conference in China, Besselink discussed with Ming Wu of Memry that

2  Memry had never made a proposal regarding his participation in the STC project.  Moyer Decl., Ex. C,

3  Besselink Dep. (Day 3) at 176:11-178:9.  This appears to have been one of the last communications with

4  Memry personnel regarding the STC project.

5    On or about February 7, 2003, Besselink discovered published patents assigned to STC and

6  naming Schetky as a co-inventor in which Besselink contends that the Biflex technology was described

7  and claimed.  Moyer Decl., Ex. C, Besselink Dep. (Day 3) at 139:4-143:3; *id.*, Ex. D., Besselink Dep.

8  (Day 4) at 398:6-25.

9    Besselink has since filed additional patent applications that claim priority to the original January

10  24, 1997 '359 provisional application.  Besselink filed U.S. patent application Serial No, 11/317,495

11  ("the '495 application") on December 22, 2005 and  U.S. patent application Serial No, 11/391,940 ("the

12  '940 application") on March 29, 2006.  Those patent applications have now both been published as U.S.

13  Publication Nos. 2006/0241739 and 2006/0217795 respectively.

14  **B.    Procedural History**

15    The court has previously addressed counterdefendants' arguments directed at KOT's third

16  counterclaim for misappropriation of trade secrets.  Counterdefendants previously moved to dismiss this

17  counterclaim on the grounds that it is barred under the statute of limitations.  Although the parties asked

18  the court to consider a critical October 17, 2000 letter from Schetky to Besselink under the incorporation

19  by reference doctrine, the court declined to do so.  Based solely on the allegations of the counterclaims,

20  the court determined that it could not

21             conclude from the counterclaim alone that the statute has expired.  On the
               one hand, some of KOT's allegations suggest that a reasonable person in
22             Besselink's position might have been suspicious when Schetky asked to
               borrow the demonstration Biflex stent on July 1, 2000 or indicated in his
23             October 17, 2000 letter that he was meeting with STC to discuss using
               the bistable concept in oil wells.  Counterclaim ¶¶ 18, 20.  Yet several
24             facts cut the other way.  Besselink and Schetky were business partners.
               In addition, Schetky allegedly stated that Besselink's Biflex knowledge
25             "was completely different from the oil wellbore concepts Schetky was
               working on."  Counterclaim ¶ 19.  Besselink and Schetky's previous
26             relationship and Schetky's assurances to Besselink could have reasonably
               precluded Besselink from becoming suspicious.  A motion to dismiss is
27             not the appropriate vehicle to resolve this fact-bound issue.

28

ORDER RE: MEMRY AND STC'S MOTIONS RE: KOT'S COUNTERCLAIMS FOR TRADE SECRET MISAPPROPRIATION AND
BREACH OF THE COLLABORATION AGREEMENT BASED ON MISUSE OF CONFIDENTIAL INFORMATION—C-04-03843
RMW
MAG                                                  8

1    Order Granting in Part and Denying in Part Counterdefendants' Motion to Dismiss dated April 8, 2005

2    ("April 8, 2005 Order") at 9.

3         The parties subsequently sought summary judgment based on KOT's lack of a pecuniary interest

4    in the asserted trade secret.  STC's Mot. Partial Summ. J. that KOT Lacks Standing to Assert Causes of

5    Action for Trade Secret Misappropriation, Correction of Inventiorship, Docket No. 126.  The court

6    denied the motion for summary judgment, determining that KOT could satisfactorily prove that interest

7    in the trade secrets had successfully passed from Besselink to MMH, from MMH and United Stenting

8    to Jomed, from Jomed to Abbott, and from Abbott to KOT.  December 18, 2006 Order Denying

9    Counterdefendants' Motion for Partial Summary Judgment Contingent on Proof of Authentication

10   ("December 18, 2006 Order"), Docket No. 228.  The court's ruling was contingent upon KOT offering

11   sufficient authentication of documents purporting to show that the trade secrets were transferred from

12   Jomed to Abbott.  *Id.* at 10.  The statute of limitations question was mentioned in passing as part of this

13   motion for partial summary judgment.  Addressing the statute of limitations, the court stated, "The court

14   still finds, as it did in its April order, that while 'a reasonable person in Besselink's position might have

15   been suspicious . . . Besselink and Schetky's previous relationship and Schetky's assurances to Besselink

16   could have reasonably precluded Besselink from becoming suspicious' of the alleged misappropriation."

17   *See id.* at 5 n.6.

18                                          **II.  ANALYSIS**

19        **A.    Legal Standard**

20        Summary judgment is proper when the pleadings, discovery, and affidavits show that there is

21   "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

22   of law."  FED. R. CIV. P. 56(c).  Material facts are those which may affect the outcome of the case.

23   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine

24   if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Id.*  A

25   party moving for summary judgment who does not have the ultimate burden of persuasion at trial has

26   the initial burden of producing evidence negating an essential element of the non-moving party's claims

27   or showing that the non-moving party does not have enough evidence of an essential element to carry

28

ORDER RE: MEMRY AND STC'S MOTIONS RE: KOT'S COUNTERCLAIMS FOR TRADE SECRET MISAPPROPRIATION AND
BREACH OF THE COLLABORATION AGREEMENT BASED ON MISUSE OF CONFIDENTIAL INFORMATION—C-04-03843
RMW
MAG                                               9

1    its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099,

2    1102 (9th Cir. 2000).  A court may grant a motion for summary judgment in part and narrow the issues

3    remaining for trial.  *See* FED. R. CIV. P. 56(d).

    **B.**    **Motion for Partial Summary Judgment on KOT's Misappropriation Claim and STC's Motion to Strike Declaration of Steven Kipperman**

In its December 18, 2006 Order, the court permitted KOT to submit additional material to supplement the record in order to authenticate agreements between Jomed and Abbott.  In response, KOT submitted the Declaration of Steven Kipperman, which stated that, as the director of new business development for Abbott Laboratories, he directed the retrieval of the documents from Abbott's files related to the acquisition of intellectual property rights from Jomed.

Counterdefendants object to this declaration as insufficient and move to strike it, arguing that what was required to authenticate the agreements at issue was a declaration from a person who had personal knowledge of the contents of the document, i.e., someone who authored the agreements or was otherwise involved in the negotiations or transactions memorialized by the agreements.  They also contend that the failure of the declarant to physically attach the documents being authenticated (referring instead to the attachments to the Declaration of Nicola Pisano, which was found by the court to be insufficient to authenticate the disputed agreements) makes the declaration fatally deficient.

The court finds that Kipperman's declaration is marginally sufficient to authenticate the disputed agreements.  There is no ambiguity as to which documents Kipperman's declaration refers, even if they are not attached.  Further, Kipperman's declaration states that he has personal knowledge that these agreements are maintained in the course of ordinary business activities and that he, as a director-level employee of Abbott, directed the documents to be retrieved from Abbott's files.  This is sufficient to satisfy the court that the documents are what they are represented to be.  FED. R. EVID. 901(a).  Thus, because KOT was able to successfully authenticate the agreements regarding the transfer of intellectual

1    property rights from Jomed to Abbott, the court affirms its denial of counterdefendants' motion for

2    partial summary judgment that KOT lacks standing to assert claims for trade secret misappropriation.[4]

3          **C.     Memry and STC's Motions for Partial Summary Judgment that KOT's Claim for
                    Trade Secret Misappropriation is Barred by the Statute of Limitations**

4

5          Memry and STC, by way of separate motions, contend that KOT's third counterclaim for

6    misappropriation of trade secrets is barred by the three-year statute of limitations because Besselink and

7    Wilfried van Moorleghem had actual knowledge no later than October 2000 that Memry had disclosed

8    at least one of KOT's alleged trade secrets to STC, which actual knowledge gave them sufficient

9    constructive knowledge to protect any trade secret they believed they held regarding the use of biflex

10   technology in oil well applications. "While resolution of the statute of limitations issue is normally a

11   question of fact, where the uncontradicted facts established through discovery are susceptible of only

12   one legitimate inference," a court may determine a statute of limitations issue as a matter of law. *Jolly*

13   *v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1112 (1988).

14         Under California Uniform Trade Secrets Act, an action for misappropriation of a trade secret

15   must be brought "within three years after the misappropriation is discovered or by the exercise of

16   reasonable diligence should have been discovered." Cal Civ Code § 3426.6. Under California law, "a

17   *suspicion* of wrongdoing, coupled with a knowledge of the harm and its cause, will commence the

18   limitations period." *Jolly*, 44 Cal. 3d at 1111 (interpreting Cal. Code of Civ. Proc. § 340) (emphasis in

19   original). In the trade secret context, "[w]hen there is reason to suspect that a trade secret has been

20   misappropriated, and a reasonable investigation would produce facts sufficient to confirm this suspicion

21   (and justify bringing suit), the limitations period begins, even though the plaintiff has not conducted

22   such an investigation." *Alamar Biosciences Inc. v. Difco Laboratories Inc.*, 40 U.S.P.Q.2d 1437, 1439-

23   1440 (E.D. Cal. 1996). A plaintiff with misappropriation of trade secrets claims may suffer severe

24   consequences for sleeping on its rights:

25

26   _____

27         [4]     The court acknowledges that a separate motion is under submission based in part on
     this assignment in which Memry again asserts that KOT lacks standing to assert claims in this
     action.

28   ORDER RE: MEMRY AND STC'S MOTIONS RE: KOT'S COUNTERCLAIMS FOR TRADE SECRET MISAPPROPRIATION AND
     BREACH OF THE COLLABORATION AGREEMENT BASED ON MISUSE OF CONFIDENTIAL INFORMATION—C-04-03843
     RMW
     MAG

> [W]hen the statute of limitations begins to run on some of a plaintiff's trade secret claims against given defendants, the statute also begins to run at the same time as to other trade secret claims against those same defendants, even if there have not yet been any acts of misappropriation of the other trade secrets, at least when the plaintiff shared all the trade secrets with the defendants during the same time period and in connection with the same relationships and when the trade secrets concern related matters.

*Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 525 (N. D. Cal. 2000) (Armstrong, J.). This rule is animated by the principle that "once plaintiff knows or should know that a defendant who once was trusted has shown, by any act of misappropriation, that he cannot be trusted, plaintiff should know that there is a risk that defendant will commit additional acts of misappropriation . . . ." *Id.*

When a claim for trade secret misappropriation is pled as a counterclaim and arises out of the same facts as the plaintiff's claim, the statute of limitations "is a bar to the defendant's affirmative claim only if the period has already run when the complaint is filed. The filing of the complaint suspends the statute during the pendency of the action, and the defendant may set up his [counter]claim by appropriate pleading at any time." *Sidney v. Sup. Ct.*, 198 Cal. App. 3d 710, 715 (1988). This principle applies to KOT's counterclaims, so although KOT filed its counterclaims on November 4, 2004, since Memry commenced this action in May 2004, the court must determine whether KOT or its principals had discovered or reasonably should have discovered the alleged misappropriation by Memry and STC by May 2001.

**1.    Discovery of Misappropriation**

In its supplemental identification of trade secrets submitted to STC and Memry on July 5, 2005, KOT identified 26 trade secrets, which can be generally grouped as follows: ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1  ████████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ██████████████████████████████████████ Cass Decl., Ex. 5, Supplemental Identification

4  of Trade Secrets at 2-15; *id.*, Ex. 6, KOT's Further Supplemental Responses to STC's Interrogatory Nos.

5  3, 5 and 9. Both counterdefendants contend that Besselink had actual notice at least as of October 2000

6  that Memry and STC were planning to use the Biflex technology in oil well applications, which is one

7  of the trade secrets KOT claims was misappropriated. KOT, on the other hand, asserts that Besselink

8  first became aware of the alleged misappropriations in 2003 when he discovered that several published

9  patent applications claiming and describing Biflex technology named Schetky and various STC

10  employees as co-inventors.

11          Counterdefendants' main evidence consists of the July 1, 2000 email from Schetky to Besselink

12  asking to borrow a demonstration biflex stent to demonstrate to Schlumberger; the conversation between

13  Besselink and Schetky and Binch of Memry at the Crimea Conference at which Memry expressed

14  interest in using bistable cells in oil well applications in conjunction with the STC project; and the

15  October 17, 2000 letter from Schetky to Besselink informing him that a patent application for the use

16  of bistable cells in oil wells had been drafted.

17          In response, KOT asserts that Besselink, Binch and Schetky's discussion at the Crimea

18  Conference did not concern the use of expandable devices in the oil well project contemplated by STC,

19  rather simply the use of bistable cells. Besselink testified that someone at the Crimea conference "may

20  have mentioned the cell, but a cell is something else than an expandable device. . . . Cell [sic] can be

21  used for anything. In the switch for the light, there's a bistable unit." Moyer Decl. Ex. A at 194:5-21.

22  KOT also provides evidence that van Moorleghem did not immediately recognize the follow-up requests

23  from Ming Wu for demonstration stents as anything other than the demonstration of a principle that

24  could be used for many other applications than just a tubular expandable device. He testifies that he had

25  no idea that Memry and Schlumberger intended to scale up the of the Biflex stents. Moyer Decl., Ex.

26  G, Van Moorleghem Depo. (Day 3) at 559:22-562:15. Further, KOT points to Schetky's email in

27  response to Besselink's October 11, 2000 inquiry as evidence that Besselink and van Moorleghem

28

1    reasonably concluded that  Schetky was using bistable technology other than that Besselink claims to

2    have invented.  Moyer Decl., Ex. O ("As you know there are a wide variety of bistable structures which

3    have been exploited, and the choice will strongly depend on the method of fabrication.")

4         Notwithstanding KOT's arguments to the contrary, the evidence presented by both parties

5    demonstrates that Besselink had notice of the alleged misappropriation at least as of the date of

6    Schetky's October 17, 2000 letter.  It is true that Schetky's July 1, 2000 email asking for the stents for

7    demonstration  did  not  state  exactly  why  the  STC  people  would  have  been  interested  in  the

8    demonstration.  Besselink testified that even after Wu's follow-up email after the Crimea Conference

9    he did not understand why Memry had asked to use his stents for "show and tell" to STC.  Both he and

10   van Moorleghem assert that they were not told the precise parameters of the STC project when it was

11   discussed at the Crimea conference or anytime thereafter and could not ascertain the anticipated use of

12   the bistable cells in the STC project.  And both Besselink and van Moorleghem have testified that

13   Schetky's email in response to his October 11, 2000 email led them to believe that Schetky was

14   considering bistable technology other than that Besselink claimed to have invented in the STC project.

15        However, even assuming that all of these statements are true, when presented with Schetky's

16   October 17, 2000 letter to Besselink, no reasonable juror could conclude that Besselink was not aware

17   that Schetky believed that he had conceived of the application of Besselink's Biflex technology in oil

18   wells and that a patent application had been prepared on the use of the Biflex technology in oil wells

19   listing at least Schetky of Memry and Johnson of STC as inventors.  The statements in that letter

20   provided Besselink with clear notice that Memry and STC were intending to use and claimed having

21   invented the use of Besselink's Biflex technology in oil well applications.  In the October 17, 2000

22   letter, Schetky clearly identifies the technology Besselink claimed to invent. Moyer Decl. Ex. P

23   ("[W]hen I thought of the idea of using the bistable cell configuration to create an expandable down hold

24   pipe for the oil wells, I spoke with you about the subject and whether you were interested in

25   participating.  At that time you indicated that with your activity in getting the Biflex Stent into

26   production you were not interested in other applications of the concept.").  He asserts his belief that oil

27   well applications are not covered by Besselink's patent.  *Id.* ("The bistable cell which you employ for

28

ORDER RE: MEMRY AND STC'S MOTIONS RE: KOT'S COUNTERCLAIMS FOR TRADE SECRET MISAPPROPRIATION AND
BREACH OF THE COLLABORATION AGREEMENT BASED ON MISUSE OF CONFIDENTIAL INFORMATION—C-04-03843
RMW
MAG                                                    14

1  a specific product has been disclosed in the literature, and anyone can use this as long as it is not an

2  infringement of your patent.  However, we realize that the concept did originate with you . . .").  He

3  informs Besselink that a patent application omitting Besselink as an inventor has been prepared, stating

4  that only Memry and STC employees were to be named as inventors.  *Id.* ("I also conveyed to you the

5  fact that a patent application has been prepared and will have as the inventors Craig Johnson of

6  Schlumberger, and me, representing Memry, as the inventors.").  The letter goes on to suggest that

7  Besselink participate in the project as a consultant and to propose areas in which Besselink's

8  contributions would be helpful and his compensation structure, but it is clear that Memry and

9  Schlumberger's intend to proceed with or without Besselink's involvement.  *Id.*

10          Nevertheless, KOT argues that the October 17, 2000 letter could be reasonably understood to

11  lead Besselink and van Moorleghem into erroneously believing that Schetky was claiming to have

12  invented oil well applications using bistable technology unrelated to the Biflex technology.  Besselink

13  testified that upon receipt of the October 17, 2000 letter from Schetky, he thought that oil well

14  applications were covered by his patent application and his trade secret, so he believed that Schetky's

15  assertion that he had thought of the idea of applying bistable cells to oil wells meant that Schetky was

16  going to use another technology.  Moyer Decl., Ex. A., Besselink Depo (Day 1) at 186:16-24.  Van

17  Moorleghem testified that he similarly believed that Schetky was not referring the Besselink's invention,

18  but to an electrical switch or something else.  Wexler Decl. Ex E, Van Moorleghem Dep. (Day 3) at

19  584:2-15.  These assertions are unreasonable given the clarity of the disclosure in Schetky's October 17,

20  2000 letter, as set forth above.  *See also*  Moyer Decl. Ex. P ("The bistable cell which you employ for

21  a specific product has been disclosed in the literature, and anyone can use this as long as it is not an

22  infringement of your patent for the medical application.  However, we realize that the concept did

23  originate with you . . .").

24          KOT also contends that Memry was authorized to disclose the trade secrets to STC.  KOT argues

25  that because there is no misappropriation of a trade secret when a person discloses the trade secret with

26  the express or implied consent of its owner, Cal. Civ. Code § 3426.1(b)(2), if Memry was authorized

27  to disclose to STC, there could have been no claim for misappropriation in 2000.  It presents evidence

28

ORDER RE: MEMRY AND STC'S MOTIONS RE: KOT'S COUNTERCLAIMS FOR TRADE SECRET MISAPPROPRIATION AND
BREACH OF THE COLLABORATION AGREEMENT BASED ON MISUSE OF CONFIDENTIAL INFORMATION—C-04-03843
RMW
MAG                                                        15

1    that on March 31, 2000, van Moorleghem had a telephone conversation with Craig Johnson at STC

2    concerning STC's interest in talking to Memry Europe about using shape memory alloys ("SMAs") for

3    oil drilling.  Wexler Decl., Ex. E, van Moorleghem Dep. (Day 3) at 472:23-475:5.  After referring

4    Johnson to Binch and other Memry employees, van Moorleghem authorized Binch to show STC a sales

5    presentation by U.S. Inc. for the Biflex Technology and sent the presentation to them via email.  *Id.* at

6    477:8-479:25; Wexler Decl., Ex. I, (Biflex presentation). However, as both STC and Memry point out,

7    van Moorleghem repeatedly testified that he had no idea what the STC project was about, thus it is

8    disingenuous to both assert that there is a question of fact as to whether van Moorleghem authorized the

9    disclosure to STC and that van Moorleghem had no idea that the Biflex technology was to be used by

10   STC.

11          Based on Schetky's October 17, 2000, Besselink was on notice regarding potential

12   misappropriation of his trade secrets regarding the Biflex technology for use in oil well applications.

13   He did not ask Schetky or anyone else for a copy of the patent application referenced in Schetky's letter

14   nor did he contact Schlumberger to discuss the Biflex technology or the project described in the letter.

15   Ryan Decl, Ex. 2 at 201:15-19, 177:5-6.  There is no genuine issue of material fact as to whether the

16   statute of limitations had begun to run.  Unlike the disclosure that was found not to trigger the statute

17   of limitations in *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 318 F. Supp. 2d. 222

18   (D. Del. 2004), Schetky's letter stated only his belief that the patent application and use of bistable

19   technology did not impair Besselink's right in his patent application concerning medical devices.  *See*

20   *id.* at 225 ("Rider's reply letter . . . in which Callaway stated that if Callaway 'ultimately develop[s] and

21   introduce[s] a polyurethane golf ball, [it would] do so in a way that respects the patents and proprietary

22   rights of others' . . . gave Dunlop the assurances it needed to refrain from litigation.").[5]  It does not, as

23   KOT argues, give Besselink the assurances he needed to refrain from litigation.

24          The trade secrets asserted by KOT all directly relate to the use of the Biflex technology in oil

25   _____

26          [5]     The order from *Synopsis, Inc. v. Magma Design Automation, Inc.*, Case No. 04-03923
      MMC (N.D. Cal. May 18, 2005) that KOT cites in support of this argument is likewise

27   distinguishable because Schetky's letter contains no assurance that Memry intends to respect
      anything other than the patent right it believes Besselink to have in the application of the Biflex

28   technology to medical devices.

1    well applications, as they all concern cell design techniques as well as evaluation, testing,

2    manufacturing, and cutting know-how relevant to scaling up Besselink's stent designs.  The court finds

3    that Besselink had notice that Schetky was intending to use its Biflex technology for the STC project

4    and thus either know or certainly could have, by the exercise of reasonable diligence, discovered the

5    misappropriation of the asserted trade secrets at least as of October 17, 2000.  *Forcier*, 123 F. Supp. 2d

6    at 525; *Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App. 4th 1018, 1026 (2000) ("We agree with the

7    federal court [in *Intermedics, Inc. v. Ventritex*, Inc., 822 F. Supp. 634 (N.D. Cal. 1993)] that 'California

8    law assumes that once a plaintiff knows or should know that a particular defendant cannot be trusted

9    with one secret, it is unreasonable for that plaintiff simply to assume that defendant can be trusted to

10    protect other secrets'").

11                    **2.        Fraudulent Concealment**

12              KOT argues that fraudulent concealment by Memry and STC tolls the limitations period.  KOT

13    presents evidence the STC and Memry sought to conceal their use of Biflex technology.  In at least two

14    emails, Johnson at STC expressed concern that STC's rights in oil well applications might be impaired

15    by virtue of the origination of the bistable stent with Besselink.  Wexler Decl. Ex. J (June 28, 2000 email

16    from Schetky to Johnson), Ex. K (email from Johnson to Pat Bixenman).  In an October 7, 2000 email

17    commenting on a draft patent application, Schetky cautioned Johnson "to avoid copying figures and

18    numbers which have been used in Besselink's papers or patents" and advised him to create new

19    drawings.  Wexler Decl, Ex. L.  In 2002, Memry cautioned STC against using the term "biflex" in an

20    article being prepared by STC for the Society of Petroleum Engineers, urging the use of "bistable" or

21    some other wording. Wexler Decl., Ex. P (December 13, 2002 email from Binch to Schetky); *id.* Ex.

22    Q (December 21, 2000 email from Schetky to Johnson).  In April 2003, Schetky continued to offer

23    suggestions for terminology that would not "conflict with the medical stent." Wexler Decl., Ex. R (April

24    2, 2003 email from Schetky to Johnson).  Although this evidence indicates that there was some effort

25    to avoid copying Besselink's papers and patents verbatim and even to avoid conflict with Besselink, it

26    does not indicate fraud.  Particularly in light of the October 17, 2000 letter to Besselink, this evidence

27    does not raise a material issue of fact as to fraudulent concealment.  Based on the evidence presented,

28

1    this is not a case where any representation by STC or Memry to Besselink hindered his discovery that

2    trade secrets were being misappropriated. *Cf. El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040 (9th

3    Cir. 2003) (where defendant's misrepresentations and forgery hindered plaintiff's discovery of the breach

4    of a franchise agreement). As set forth above, the October 17, 2000 letter gave Besselink clear notice

5    that STC and Memry were claiming the application of his Biflex technology to oil wells, which, as set

6    forth above, put him on notice that Memry and STC may have been misappropriating the other related

7    categories of trade secret KOT has asserted.

8         At oral argument on this matter, KOT asserted that Cal. Civ. Code § 1710(3), which defines

9    deceit as "[t]he suppression of a fact by one who is bound to disclose it, or who gives information of

10   other facts which are likely to mislead for want of communication of that fact," supports an inference

11   that the statements in Schetky's October 17, 2000 letter were fraudulent. As KOT's argument goes, a

12   jury could conclude that Besselink and van Moorleghem did not understand Schetky's statements to

13   mean that confidential trade secrets were being used. According to KOT, KOT's predecessors

14   authorized Memry to make disclosures regarding the bistable technology but Schetky represented "The

15   bistable cell which you employ for a specific product has been disclosed in the literature, and anyone

16   can use this as long as it is not an infringement of your patent." Moyer Decl., Ex. P. KOT thus asserts

17   that both Besselink and van Moorleghem were misled by Schetky's statement that they were only using

18   that which "has been disclosed in literature." They understood him to be saying that the Memry/STC

19   project was not using trade secrets at issue because it was not using anything that had not previously

20   been published. KOT urges that this constitutes a misrepresentation under § 1710. The court disagrees.

21   Given the clarity of Schetky's letter discussed above, no reasonable jury could conclude that Besselink

22   and van Moorleghem should not have recognized that Schetky was announcing his intention of using

23   the Biflex technology in oil well applications, which would have put Besselink and van Moorleghem

24   on notice that the trade secrets currently being disputed were at risk of misappropriation.

25        KOT also presents evidence that Besselink and Schetky have known one another since the early

26   1990s and that van Moorleghem has known Schetky since 1986. The evidence demonstrates that these

27   men have, indeed, socialized together, visited one another's homes and even co-chaired conferences in

28

1    the SMA industry.  However, van Moorleghem and Besselink's personal or even business relationships

2    with Schetky cannot reasonably negate the strong statement in Schetky's October 17, 2000 letter that

3    Memry and STC were embarking upon applying the Biflex technology in the context of oil wells and

4    had claimed inventing that application.  Thus, the evidence of the relationship between Besselink, van

5    Moorleghem and Schetky does not reasonably support either KOT's delayed discovery or fraudulent

6    concealment theory.

7          **D.    Memry's Motion for Partial Summary Judgment that KOT's Claim for Breach of
                the Collaboration Agreement Based On Misuse of Confidential Information is
8                Barred Under the Statute of Limitations**

9          California's statute of limitations for breach of contract claims is four years. Cal. Civ. Code §

10    337.  Memry argues, citing *Forcier*, that where a claim is based upon the misuse of confidential

11    information, the statute of limitations applicable to trade secret misappropriation should apply to the

12    breach of contract claim.  This is a misreading of *Forcier*.  While the statute of limitations for the breach

13    of contract and trade secret misappropriations claims may have started running at the same time, the

14    four-year statute of limitations for breach of contract claims would make KOT's claims timely if filed

15    before October 17, 2004.  Since Memry filed this action against KOT in May 2004 and the statute of

16    limitations is tolled during the pendency of an action based upon the same operative facts, KOT's

17    counterclaim for breach of contract based on misuse of confidential information is timely.

18          **E.    Memry's Motion for Summary Judgment That KOT Is Estopped From Asserting
                Loss of Trade Secrets**
19

20          Counterdefendants have also made two motions concerning KOT's third counterclaim: STC's

21    Motion for Partial Summary Judgment that STC Did Not Misappropriate Any Trade Secrets and

22    Memry's Motion for Partial Summary Judgment that KOT is Estopped From Asserting Loss of Trade

23    Secrets.

                        **1.    STC's Alleged Misappropriation**
24

25          STC contends that it is entitled to partial summary judgment that it did not misappropriate any

26    trade secrets belonging to KOT.  STC submits the declarations of Memry employees in Menlo Park

27    stating that they did not pass information to Schetky about the "scale up" of Besselink's Biflex stents.

28    STC also submits declarations from the STC project members stating that the only information they

1    received was the Besselink Article.

2        Although Schetky testified that he does not recall having received any information from

3    Besselink or van Moorleghem aside from the Besselink Article and denies having passed any

4    information other than the article to STC, Schetky Decl. ¶ 21, the evidence submitted by KOT in the

5    form of the opinion of its expert Dr. Kenneth Perry presents an issue of fact as to whether Schetky had

6    access to the claimed trade secrets.  Because counterdefendants have also moved to disqualify the expert

7    testimony of Dr. Kenneth Perry, the court does not address STC's motion that it did not misappropriate

8    any trade secrets here.  It will separately address that motion in conjunction with the motion to

9    disqualify Dr. Perry's testimony.

10                    **2.    Estoppel**

11        STC argues that this court should apply judicial estoppel to prevent KOT from taking

12    inconsistent positions before the PTO and this court.  STC asserts that KOT representatives have failed

13    to disclose the trade secrets asserted in this action in the continuation-in-part patent applications

14    published in 2006 (the '495 application and the '940 application) that were based upon the original

15    Besselink Applications.  Because of this failure, STC contends that this court should apply judicial

16    estoppel to prevent KOT from asserting the loss of trade secrets in this action.

17        STC argues that because the best mode requirement set forth in 35 U.S.C. § 112 requires the

18    inventor to update the best mode upon filing a continuation-in-part application adding new matter, that

19    KOT was required to include all trade secrets that KOT asserts in this action.  The test for compliance

20    with the best mode inquiry is a fact question, involving a two-pronged inquiry:

21                The first prong is subjective, focusing on the inventor's state of mind at
                the time he filed the patent application, and asks whether the inventor
22                considered a particular mode of practicing the invention to be superior to
                all other modes at the time of filing.  The second prong is objective and
23                asks whether the inventor adequately disclosed the mode he considered
                to be superior.
24
    *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1330 (Fed. Cir. 2002).  STC fails to
25
    present any evidence that the best mode for practicing the inventions claimed the '495 application and
26
    the '940 application requires the disclosure of the trade secrets asserted in this action.  It presents no
27
    evidence that Besselink had a subjective belief that the trade secrets were part of a superior method of
28

practicing the claimed inventions at the time of filing. KOT, on the other hand, presents a declaration of Besselink, who states that he had not formed a subjective understanding that the trade secrets at issue in this litigation would be applicable as best modes of practicing the invention in either published application. Besselink Decl. ¶ 9. Further, it appears that the '495 and '940 applications are directed toward different applications of the Biflex technology, helical and bidegradeable Biflex stents, to be specific. Thus, the court denies STC's motion for partial summary judgment that KOT is estopped from asserting loss of trade secrets.

### III.  ORDER

For the reasons set forth above, the court:

1.  grants counterdefendants' motion for partial summary judgment that KOT's claim for misappropriation of trade secrets is time-barred under the three-year statute of limitations;

2.  denies Memry's motion for partial summary judgment that KOT's breach of contract claim based on the misuse of confidential information is time-barred; and

3.  denies Memry's motion for partial summary judgment that KOT is estopped from asserting loss of trade secrets based on representations before the patent office.

DATED:        9/20/07

*Ronald M Whyte*

RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Memry:**
Andrew C. Ryan        ryan@cantorcolburn.com
William J. Cass        wcass@cantorcolburn.com
Thomas Mango        tmango@cantorcolburn.com
Benjamin J. Holl        benjamin.holl@dbr.com
Charles A. Reid, III        charles.reid@dbr.com

**Counsel for STC:**
Nancy J. Geenen        ngeenen@foleylaw.com
David B. Moyer        dmoyer@foley.com
Kimberly K. Dodd        kdodd@foley.com

**Counsel for KOT:**
Michael H. Bierman        mbierman@luce.com
Nicola A. Pisano        napisano@JonesDay.com
Jeffrey David Wexler        jwexler@luce.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**        9/20/07                        /s/ MAG
                                        **Chambers of Judge Whyte**